AVIKAINEN *v.* BALTIC MINING CO.

MASTER AND SERVANT — FELLOW-SERVANT — MINING BOSS — SAFE INSTRUMENTALITIES.

A miner who has supervision over a working assistant does not represent the master so as to charge the latter with negligence in permitting his assistant to descend by a worn-out rope, not intended for such purpose, or in failing to supply a sufficient rope for his assistant who might have descended by a ladder provided by the employer, but lowered himself into a stope by the defective appliance.

Error to Houghton; Streeter, J. Submitted January 20, 1910. (Docket No. 106.) Decided March 19, 1910.

Case by Matt Avikainen against the Baltic Mining Company for personal injuries. A judgment for defendant on a verdict directed by the court is reviewed by plaintiff on writ of error. Affirmed.

*P. H. O'Brien,* for appellent.

*Allen F. Rees,* for appellee.

HOOKER, J.   In the annexed diagram, A, B, and C
are, respectively, the fourth, fifth, and sixth levels in the
Baltic mine.   The letters O, O, O, represent a stope from
the fifth level, in the bottom of which is waste rock, which

has been broken down by miners from the overhanging
wall above.   This rock is refuse, and is left there.   W,
X, Y, and Z represent places called "mills," being spaces
left at intervals in the refuse rock, into which ore-bearing
rock, which has been broken down, is thrown, to be

loaded on a car which runs in drift or level 5. They are also the places through which the miners ascend to and descend from the top of the accumulated refuse, the place where they work. The sides of the mills are walled up, and ladders are furnished and used by the miners in ascending and descending, and no provision is made for any other method of access. Ropes are furnished and used for drawing up tools, water, etc., and they are sometimes used by the miners as a means of ascent and descent, especially when rock is being thrown in the mill for loading, when the ladder is removed. Apparently the miners prefer to use the rope, rather than to take the trouble to put down and take up the ladder; but they are forbidden to use mills, in which rock is being thrown, for ascent and descent.

The plaintiff was, at the time of the accident, what is called a "stemmer," which we understand to mean that he is a miner who is engaged in place of another temporarily absent. Whether his regular business in the mine was stemming, or whether he was only temporarily so engaged, we cannot ascertain from the record, and it is not apparent that it would make any difference. He had worked as a miner for six months. On the day on which the accident occurred, he—plaintiff—was engaged in drilling at the place marked "K" with a miner whose mate had been disabled. Kangas, plaintiff's mate at that time, directed plaintiff to get a pail of water from a hole in drift 5. It is marked "D" in the diagram. There were two ways which he might have taken to go to the hole. He might have gone to the mill marked "Y" and descended by a ladder. He chose to go down by a rope in mill W, which rope was fastened to a rail lying across the mill, as he had done many times before. While suspended by the rope, it broke, and he fell, injuring himself, and has brought this action against the mining company to recover damages for the injury. The learned circuit judge directed a verdict for defendant, and plaintiff has appealed.

The rope was badly worn. The evidence shows that

the ropes are furnished to the miners on request, for the purpose stated; that when a rope is worn out the miner asks for a new one, and if they think a rope too old for use they do not use it. That was the condition of this rope, and Kangas had been directed to get a new one. It was against orders to go down mill W where the rock was dumped, and it was the rule that the mill where the ladder was should be used, and Kangas testified that, had the mine captain caught them going down through that mill, where the rock was dumped, they might have had trouble. He said the reason they used it was because it was not so high and was a nearer way to the water hole. He said on recross-examination:

"We used both the rope and a piece of ladder to go down. We used whichever was handy. We used that for the reason that, if we used the ladder, it would have been necessary to pull them up every time, and we machine men, when we were going, we just used the rope. Nobody ever told us anything about using the rope. We didn't have no order to use the rope to go up and down. We used that because we didn't have no other order, and we thought that was the quickest way. We knew it was the regular rule of the mine to use the mill where the ladder was when we wanted to go up and down. That is a general rule. We had no business to go down there with the rope."

The negligence charged was the furnishing of a worn-out or rotten rope, and it was the theory of the plaintiff that, in allowing plaintiff to go down, Kangas acted as a master. The last thing said before the charge was by plaintiff's counsel, and it was that:

"My contention is—and I will frankly say that, if we cannot maintain that contention as a matter of law, we have no case—that the miner, Louis Kangas, in allowing the plaintiff to use that rope to go down into that mill in that stope, acted as the master as far as Mr. Avikainen was concerned as a stemmer. If that miner represented the master, and if it was carelessness on his part to allow the stemmer to use the rope, that was carelessness on the part of the defendant, and it is the particular carelessness

charged in our declaration. * * * While I will admit that it is a narrow proposition, I claim that in allowing the plaintiff to use that rope the miner, Kangas, represented the master; and if that proposition, as a proposition of law, is not true, if it is not the law, then I will say frankly to this court that we have no case, because I want to get the thing just as clear before the court as I can. There is no necessity of citing decisions on that point."

Upon this statement the court directed the verdict. The rope was new when it was put in use. It had become worn by long use. It was not designed to be used for climbing or descending, and, if we understand the testimony aright, it was unfit for raising drills, and was no longer used for that purpose; Kangas having been ordered to get a new one. If there was any negligence upon which plaintiff may recover, it is the failure of Kangas to get a new rope for another purpose, thereby making it possible for his fellow-servant to be injured through an improper use of the rope and a disobedience of orders. We are of the opinion that no negligence on the part of the master was shown, and that, if Kangas was negligent in omitting to get a new rope, or allowing plaintiff to attempt a descent of the rope (if he knew of his intention to do so), it was the negligence of a fellow-servant. Kangas was simply a fellow miner, who by reason of seniority was director or boss of their operations, much as a section foreman is to a section gang on a railroad.

The judgment is affirmed.

MONTGOMERY, C. J., and OSTRANDER, MOORE, and STONE, JJ., concurred.